UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
United States of America

                                     Cr. No. 11-30 (S-1)(KAM)

-against-


Benjamin Castellazzo,

                Defendant.
------------------------------------------------------X


# DEFENDANT BENJAMIN CASTELLAZZO'S
## MEMORANDUM IN AID OF SENTENCING


                            James J. DiPietro, Esq.
                            Attorney for Defendant
                            Benjamin Castellazzo
                            186 Joralemon Street
                            Brooklyn, New York 11201
                            (718) 875-4207

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
United States of America

Cr. No. 11-30 (S-1)(KAM)

　　-against-

Benjamin Castellazzo

　　　　　　　Defendant.
------------------------------------------------------X

## DEFENDANT BENJAMIN CASTELLAZZO'S
## MEMORANDUM IN AID OF SENTENCING

### I.  Preliminary Statement

　　　This memorandum is respectfully submitted in connection with the
sentencing of Benjamin Castellazzo scheduled for January 30, 2013 at 11
A.M.  Mr. Castellazzo has pled guilty to a one count superseding
information charging him with a racketeering conspiracy in violation of Title
18, United States Code, Section 1962(d). Mr. Castellazzo's health, age, early
guilty plea, remorse and character support a finding that leniency is
appropriate pursuant to the sentencing factors reflected in 18 U.S.C.
§3553(a).

　　　I write to present a far more balanced picture of the person the Court
is about to sentence. As is typical in virtually all criminal matters which are
resolved through a guilty plea, the only information now before the Court
with respect to Mr. Castellazzo is his admitted participation in criminal
conduct. There is, however, a starkly different side of this defendant which I
believe will assist in Your Honor's difficult task of determining an

appropriate sentence for him which, as the Court knows must be "sufficient but not greater than necessary" for the crime to which he has pleaded guilty and for which he has taken full responsibility.

To further this last purpose and to supplement Part C of the PSR, I am enclosing for this Court's review various letters written on behalf of my client Benjamin Castellazzo. While it is never easy to convey the essence of a person with words alone, we have been greatly helped by Mr. Castellazzo's family and friends. Whether written by his wife, children, or a teacher these letters strike the same chords. They all attest to the following attributes- Mr. Castellazzo's dedication to his family, his selflessness, and his strength through adversity. Their letters are attached (see defendant's Exhibits 2-13).

Of significance, the letter written by Mr. Castellazzo to this Court sets forth in no uncertain terms his deep remorse and unconditional promise to be rid of his past life involving crime. (see defendant's Exhibit 1 attached).

It is clear that imposition of sentence by Your Honor will be, in many respects, a positive event for Benjamin and his family. Hopefully, sentence will represent a dividing line between his total failure of judgment in having engaged in this criminal conduct for which he is responsible and for which he has taken full responsibility. With the Court's wise judgment, a brighter future --- of which Benjamin is clearly capable--- will be his. Sentencing will also bring an end to the strain and uncertainty which has loomed over the entire Castellazzo family since his arrest slightly over two years ago.

However, before continuing, I must be clear that it is hardly my intention in this Memorandum to attempt to minimize the seriousness of the offenses for which Benjamin Castellazzo has accepted complete responsibility or the nature of what he has done. As is discussed more fully below, my client understands quite clearly the crimes he committed and is extremely remorseful and is prepared to be sentenced.

Nevertheless, even in this, the age of Sentencing Guidelines, albeit discretionary/advisory guidelines, the true measure of any defendant cannot be taken in an isolated fact pattern or even in an isolated series of transactions. Rather, in evaluating what sort of punishment must be meted out to achieve some purpose of general or specific deterrence or rehabilitation, a much broader view of a defendant must be taken into

2

consideration. In any system of structured justice, that view must necessarily include the nature of the defendant's life as well as the cost of his criminal conduct to him as he approaches sentencing.

## II. Sentencing Factors which "Shall be Considered" under Section 3553

Surely the Court is far more familiar than counsel with the fact that post-Booker, the guidelines are not mandatory, but are to be considered as merely one of the relevant sentencing factors under 18 U.S.C. §3553(a)(1) and (2). (See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). The factors to be considered include, in addition to the applicable guideline range, and at least as importantly, the nature and circumstance of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. The statute also directs the Court to consider the kinds of sentences available, the guidelines and policy statements of the Sentencing Commission, including the guideline range, the need to avoid disparity and the need to provide restitution where applicable. Finally, as the Court also knows, the goal is to achieve the oft quoted paradigm from Section 3553(a): "… a sentence sufficient but not greater than necessary to" comply with the above purposes.

## A. The Sentencing Guidelines

Once again, this Court hardly needs counsel to remind it that United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 2005 WL 50108 at *16 (U.S. Jan.12, 2005) and United States v. Crosby, 349 F.3d 103 (2d Cir. 2005) held that "districts courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, supra, 2005 WL 50108 at *27. More recently, the Court has also held that the Guidelines are but one factor in determining a proper sentence. District Courts must consider, in addition to the Guidelines themselves, each of the sentencing factors contained in 18 U.S.C. §3553(a) and make a

3

determination of "reasonableness" in connection with the sentence imposed. As recently as December, 2007, the United States Supreme Court in Gall v. United States, 128 S.Ct. 586 (2007) spoke quite clearly in holding that appellate courts can no longer require "extraordinary circumstances to justify a sentence outside the guidelines." Indeed, Gall follows Rita, 127 S.Ct. 2456, 168 L.Ed.2d 203, 75 USLW 4471 (2007) in further deemphasizing the role of the advisory guidelines in the sentencing process. As the Court knows in Rita the Court held that the guidelines are but one factor to be considered in sentencing and that a District Court may not presume that the guidelines range is reasonable.

The written plea agreement permits Mr. Castellazzo to seek a sentence outside of the stipulated guidelines range of 77-96 months based upon the factors to be considered in imposing a sentence pursuant to Title 18 U.S.C. §3553(a).

### III.                    The Offense Conduct

On September 15, 2011 the defendant pled guilty to a one count superseding information charging him with racketeering conspiracy pursuant to Title 18 U.S.C. Section 1962(d). This information contained two specific racketeering acts which the defendant pleaded guilty to.

With regards to racketeering act one the defendant allocuted at the time of his plea that between 2001 and 2004 he agreed with others to obtain property of a commercial business from "John Doe #1". The defendant indicated that he and others agreed to obtain this property from John Doe #1 "with his consent, but at the time he made these payments he feared that he would suffer economic harm to his commercial business if such payments were not made."

The commercial business which is the subject of this racketeering act is Laquila Construction and John Doe #1 is Mr. Dino Tomassetti, Sr.

As reflected in paragraph 15 of the PSR the criminal activity involving payments made to others by Laquila Construction commenced in the "early 1990's". The litigants agree that the defendant did not become a part of the activity alleged in this racketeering act until, "[I]n or about and between 2001 and 2004, both dates being approximate and inclusive . . . .".

4

Paragraph 16 of the PSR indicates that during that time period "Laquila [1] paid $10,000 per month in protection money to the Colombo family . . . .". The PSR concludes of that monthly payment Mr. Castellazzo "kept 1,000 for himself". For the period Mr. Castellazzo was involved in accepting these payments that amounts to approximately $48,000 he personally received.

Racketeering Act Two involves a dispute between two pizzerias. One accusing the other of "stealing a pizza recipe" made famous by L & B Spumoni Gardens in Brooklyn.

In an attempt to settle this dispute the PSR indicates that alleged members of the Colombo family went to "The Square" pizzeria "to confront John Doe #2[2] about the recipes he allegedly stole." See PSR para #18.

As a result of being approached by three named individuals the dispute was eventually settled by John Doe #2 agreeing to make a one time payment of between three and four thousand dollars to his accusers. From this sum of money the PSR concludes that "Russo and Guerra[3] split most of the money, but they gave $500 to Castellazzo . . . .".

The litigants agree that Mr. Castellazzo did not learn of any alleged threats to John Doe #2 until after they might have occurred. Nonetheless, at the time of his plea allocution it was made clear by counsel that this conduct could have been "reasonably foreseeable" to him for plea purposes.

The defendant, Benjamin Castellazzo, accepts full responsibility for his conduct. He knows that his conduct was wrong and against the law. The above mentioned review of the offense conduct in this case is simply presented in mitigation of the defendant's unlawful conduct and as an aide to this Court.

---

[1]   John Doe #1 is the owner of Laquila Concrete. His name is Mr. Dino Tomassetti, Sr. Numerous news accounts based on information supplied from federal prosecutors and investigators have linked Mr. Tomassetti to organized crime. In addition to making payments to alleged crime families he has been indicted for making illegal payments to union officials over a 10 year period according to news accounts. A 2006 NY Times article indicates Mr. Tomassetti's companies have been "banned from obtaining city contracts and stripped of a special permit to operate a solid waste transfer station."

[2]   John Doe #2 has been identified in news articles as Eugene Lombardo. Mr. Lombardo has been described as an associate of the Bonano crime family by law enforcement sources.

[3]   A trial jury found Mr. Guerra not guilty of any extortionate conduct involving alleged threats made to John Doe #2 concerning this pizzeria dispute.

**IV**           **Benjamin Castellazzo's**
                 <u>Early Plea of Guilty</u>

As this Court is aware Mr. Castellazzo pleaded guilty to a superseding information some 16 1/2 months ago on September 15, 2011. At the time of the defendant's plea the defense team was trying to reach a global disposition involving seven individuals which included the defendant. The other six co-defendants to be part of this global plea disposition were: Andrew Russo, Ilario Sessa, Emanuel Favuzza, Theodore Persico, Jr., Joseph Savarese and Reynolds Maragni. A potential global resolution of this matter would have resulted in a plea agreement allowing for "global points" that would effectively lower a defendant's offense level for guidelines purposes.

As this Court knows, but for Mr. Castellazzo, the other co-defendants (except for Mr. Maragni who cooperated with the government) decided not to plead guilty early on. In fact it wasn't until approximately November, <u>2012</u> that Russo, Sessa, Favuzza, Persico, Jr. and Savarese agreed to plead guilty. In their written plea agreements their offense levels were lowered by the government allowing them <u>two global points</u>.

Mr. Castellazzo desired early on to enter a plea of guilty. He encouraged his co-defendants at various co-defendant meetings to resolve this case expeditiously. His co-defendants, however, instead of following Mr. Castellazzo's lead waited some 14 months after the defendant's plea of guilty to resolve their cases with their own guilty pleas. Again because their plea was global they were allowed two global points by the government. The defendant, on the other hand, who pled guilty some 14 months earlier was not given any global points by the government because his plea did not have the six other co-defendants to make it global.

Since the taking of his plea Mr. Castellazzo has requested several adjournments of his sentence with the government's consent. It was my client's desire to adjourn his sentence with the hope that an eventual global disposition of the remaining co-defendants might impact the government's position on his ultimate sentencing. (See defendant's Exhibit 14 attached for letters previously submitted requesting an adjournment of defendant's sentence)

The defendant entered a plea of guilty calling for a stipulated guideline range of 77-96 months. Nonetheless, under 18 U.S.C. 3553(a) Your Honor has discretion to determine an appropriate and just sentence taking into account the potential disparity in sentencing with other co-defendants.

Both the Government and counsel for Mr. Castellazzo agree that the defendant should receive consideration from this Court under 3553(a) for his early guilty plea. Mr. Castellazzo's early plea of guilty relieved both the Court and Government of pre-trial motion practice and trial and thereby conserved substantial judicial resources by accelerating the resolution of this matter. His early guilty plea clearly played a role and encouraged the original covered co-defendants to eventually plead guilty.

Again, the co-defendants who recently pleaded guilty before Your Honor received a two level global point reduction in their written plea agreements. The defendant pleaded guilty on September 15, 2011. Counsel for Mr. Castellazzo respectfully urges this Court to consider as a starting point under 3553(a), a sentence at least two levels below the guideline range contained in the defendant's written plea agreement.[4]

---

[4] In an analogous situation this Court granted defendant Roger Califano a two level global point reduction even though the covered co-defendants in his plea agreement did not enter into guilty pleas at the time of his sentencing. See Califano sentencing minutes pgs 18-20 dated September 12, 2011. Defendant's Exhibit 15 attached.

## V. Family Ties, Responsibilities
## And Characteristics of
## Benjamin Castellazzo

To further supplement Part C of the PSR I am enclosing for this Court's review various letters written on behalf of my client Benjamin Castellazzo (See defendant's Exhibits 2-13 attached). These letters ranging from Mr. Castellazzo's wife, children, grandchildren, life long friends and acquaintances attest to his devotion to his wife, children, family and overall character.

First and foremost I want to emphasize to this Court the extreme remorse this 75 year old man has reflected to me and others concerning his involvement with this case. I know he has a criminal history, but I truly believe he has now come to the realization that the only real issue in life that matters is to spend the rest of his remaining years in the comfort of his wife, children, grandchildren and great grandchildren. The defendant writes:

My name is Benjamin Castellazzo. Your Honor will be pronouncing sentence on me January 30, 2013.

I want to start this letter by emphasizing I accept full responsibility for the crimes I pleaded guilty to.

I am presently 75 years old. I have reflected on my life during the last two years I have been in jail since my arrest. I can tell Your Honor without hesitation I am not proud of the life I have led. Most importantly I know I have embarrassed my wife, my 2 children, 8 grandchildren and 5 great grandchildren. This is something I will have to live with the rest of my life.

I can tell Your Honor in all sincerity that you will never see me before this or any other court of law again. I want to spend the remaining years of my life in the comfort of my wife Sophie, children, grandchildren, and great grandchildren. These loved ones are the only family I deem important.

Thank you for reading my letter.

See defendant's Exhibit 1

8

To reinforce his commitment to leading a law abiding life the defendant in paragraph 13(b) of his written plea agreement agreed to add as a condition to his supervised release that he "will not travel into the Eastern District of New York or Southern District of New York without prior permission of the U.S. Probationer Officer assigned to supervise him." His commitment to spending his remaining years at home with his wife was certainly re-affirmed by his agreeing to this condition of his supervised release.

It is clear that no one is closer to or knows Benjamin better then his wife Sophie. Mrs. Castellazzo is 75 years old and has been married to the defendant for over 58 years. Sophie had a cancerous kidney removed in 2003 and currently suffers from heart palpitations.

Mrs. Castellazzo writes,

> My name is Sophie Castellazzo, I am the wife of Benjamin Castellazzo. We have been married for the past 58 years. We were married very young he was 16 and I was 17. In all the years I've known my husband, he has proven to be a very devoted husband, father, and grandfather. He has always played a very active role in all aspects of our lives. I was blessed to have such a caring person in my life. He was also a very good family man when it came to the elderly ones in our family, his grandmother lived with us for fifteen years, his mom lived very close to us so he can take care of her. Today you don't hear much of this. Ben played a major role in their lives as they were both widowed very young and he took the responsibility. My Children, Grandchildren, and Great Grandchildren are very close to him. We all miss him very much.
> Please find it in your heart to consider the sentencing of Benjamin I love and miss him very much. As you know we are getting older and I really wish he can come home soon.
>
> See defendant's Exhibit 2

9

His daughter, Debra Lopiccolo, who has four daughters indicates,

> My father has been there for me all my life, and I am hoping
> with your leniency that he can still be there for me. . . . He is a
> loving husband, an amazing father, and an excellent grandfather
> who has always been there for each one of my girls. . . . My
> kids, even in their ages today, still call their grandfather Pop
> . . . . My daughters have grown to start their own families,
> and he has made it a point to get to know all of the new
> additions of the family. He is an extraordinary man . . . . My
> father is 74 years old and has a high blood pressure. With the
> average life span of a man today being around 75 years old, I
> worry that his final days, if spent in prison will be missed by
> our family. Let us, and the new additions to the family get to
> spend those quality moments with him, so that they too can get
> to know the wonderful man that raised me into the woman I am
> today. I myself have my own health issues which include lymph
> edema, and fibromyalgia, both diseases have taken away from
> my quality of life. Please consider other reasonable options
> which would allow my father be close to his family.
> I appreciate your time, and hope that you would consider
> leniency. This would mean a lot to me and my family, as my
> father played a huge part in our well-being.

See defendant's Exhibit 3

Similarly his son, who also has four children, writes,

> My dad has played an important role in all of their lives. Not
> only did he attend sporting events to cheer them on and support
> them, but always had time to lend an ear when they needed
> some guidance. They have a lot of fun with him and love
> hanging out with Grandpa.
> My dad missed my eldest daughter's graduation in June; and
> we all missed him tremendously. My son Benjamin is very
> involved in wrestling and football and is also a very good
> student. Then there is Ava, my third child, who is an up and
> coming star goalkeeper on our premier soccer teams. Then there
> is my youngest daughter Rae, who writes letters often to
> Grandpa, and like Ava also likes to play sports. As for myself,

10

I miss my Dad tremendously. He does not feel the sadness I feel
in my heart. It makes me feel sad that he is missing all these
wonderful events. Not only is he hurting, but also my children.
In conclusion, I hope you find it in your heart to send my Dad
home to all of us who love and cherish him. Please be fair in
considering his age and health when its time for sentencing
him. We all miss him so much!

See defendant's Exhibit 4

Judith Travglini, a retired school teacher, who has come to know
Benjamin and Sophie informs the Court,

In my professional capacity as tutor and advisor to the family, I
found Mr. and Mrs. Castellazzo very caring and hospitable
people. Their son's education and his successes in school was
apparent from the start of my association. When working with
their son both parents always encouraged him to "work hard"
and to always "do his very best".
Ben's mother and father were equally concerned about his
education, spirit and general well being. Both parents supported
their son and worked closely with him in an effort to instill in
him the importance of his education and the opportunities an
education could afford him.
It is also noteworthy that during my work with young Ben, I
had an occasion to be present when a neighbor required help
and Mr. Castellazzo did not hesitate to go to their aid.
The values of family and community are the very fabric of our
society. In my estimation Mr. Castellazzo has always
demonstrated the importance of being a loving father and
caring, compassionate neighbor.

See defendant's Exhibit 5

The defendant's younger brother explains to the Court how the
defendant took on the responsibilities of caring for his aging grandmother
and then his mother, Anthony Castellazzo speaks of the defendant's
compassion and devotion to his family,

11

Benjamin Castellazzo is the oldest of 3 surviving siblings in my family and the patriarch. I, Anthony Castellazzo am the youngest. Benjamin and I are separated by more than 16 years. He's been and continues to be a surrogate father as our dad passed when I was only 14. Through many of the rough times during my grieving and beyond, he was there to both comfort and encourage me; to go back to school, earn a college degree, make my own way in the world, and not to forget where I came from.

A well liked man among friends and family, Benjamin never misses an opportunity to offer a warm greeting or inquire into the well being of others. And Benjamin's first priority has always been his family. It's often said that a man's character can be measured by the way he treats his mother (and grandmother). Leading by example and without hesitation he along with his wife Sophie of more than 57 years, took on the responsibility as the primary caregivers for our ailing grandmother suffering from Alzheimer's until she was nearly 97 years old. When our Mom became ill in 2002 until her death in 2007, Benjamin again stepped in, without consideration for the level of commitment in both time and resources to unselfishly provide our Mom all that was necessary until she passed at the age of 93. Arguably, that level of commitment today among children and grandchildren to care for their elders is scarce even among folks with far more resources than Benjamin has had and therefore should be celebrated. Although he won't admit it, to avoid sparing his family undue concern Benjamin is currently going through some tough times. Being incarcerated for more than a year now in the Brooklyn federal Detention Center, and being separated from his wife, 2 children, 8 grandchildren and 5 great grandchildren, has to have exacerbated his serious medical condition. We are all concerned for both his physical and psychological well being and hope that he's given every consideration.

See defendant's Exhibit 6

His daughter-in-law, Denise Castellazzo, reflects on how the defendant became an influential figure in her life,

> . . . . I came from a divorced family most of my life, and like so many kids, my father was not a major part of it. When I met my husband I was immediately welcomed with open arms by Sophie and Ben. I felt their warmth right away. I felt I knew them my whole life, that is how comfortable they made me feel. I was not used to a family with many men in it, but Ben Sr. always made me feel comfortable. About 18 years ago my father basically disappeared from my life and we no longer talk to this day. Benjamin never made me feel bad about it and was to pick up the pieces that my father had left. I used the term daughter-in-law loosely, for he treats me more like a daughter, than my own father did. He's there when you need to talk or just have a few laughs or help out with babysitting the kids. We especially miss Sunday dinners when we all came together as a family and talked about everyones week. This didn't surprise me about him, though how is with me, I have seen the love and care he has for neighbors. There is a man who lives near him. He is very poor and does not have much. Whenever Ben has clothes or shoes that he doesn't use or don't fit he always thinks of this man and brings it over to him. If he has leftover food he always makes sure to drop some off to Les so he could have some food to eat. Like the good old days I guess when neighbors took care of neighbors in time of need.
> . . . . Judge I know you don't have an easy job. My only hope is that you see My father-in-law in a different way. He is a loving, caring individual who has touched many lives, with his gentle ways. Please find it in your heart to take everything I said into consideration and give him a fair and just sentence.

See defendant's Exhibit 7

In these letters, as in the rest of the letters annexed, countless acts of kindness, to family and friends are put forth. I will not recount those facts here but respectfully refer to those materials annexed as exhibits. See defendant's Exhibits 8-13. I do submit, however, that the sort of character

13

and generosity which these letters speak of should inform the Court's decision in sentencing Benjamin Castellazzo.

## VI   **Benjamin Castellazzo's Health**

Paragraph 78 of the PSR accurately reflects that the defendant suffers from a myriad of health issues, including – high blood pressure, an enlarged prostate, high cholesterol, acid reflex, an inflamed colon, chronic kidney disease, and complications relating to an abdominal aorta aneurysm.

The defendant's aneurysm has "not improved" and is "chronic" (See defendant's Exhibit 16 attached for medical report dated January 18, 2012) A vascular surgeon from Mount Sinai Medical Center has informed the Bureau of Prisons that the defendant needs a Ct-Scan with contrast every six months due to his "4.8 cm infrarenal abdominal aorta" See defendant's Exhibit 17 attached. The medical literature informs that, "[T]he major complications of abdominal aneurysms is rupture, which is life threatening, as large amounts of blood spill into the abdominal cavity, and can lead to death  within minutes. Mortality of rupture repair in the hospital is 60% to 90%. See defendant's Exhibit 18 attached.

Since the filling of this PSR the defendant's health condition has worsened. In August of 2012 the defendant was informed that a biopsy has revealed he has cancer of the prostate. (See defendant's Exhibit 19 attached for prostate biopsy report). As of this writing the defendant has commenced radiation treatment for his condition.

Obviously, the need for Mr. Castellazzo to continually monitor his abdominal aneurysm, chronic kidney disease and cancer of his prostate are of major importance to his health and continued well being. It is highly doubtful that the Bureau of Prisons will provide this 75 year old man with the periodic testing he requires to monitor his medical condition. The PSR in paragraph 108 states that "[i]n addition to the defendant's age, he suffers from several health conditions. The Court may view these as mitigating factors for the purpose of sentencing."

14

## VII   <u>Age</u>

As this Court is aware, although age is not ordinarily relevant in determining a particular sentence, Section 5H1.1 of the guidelines specifically asserts:

> Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement may be equally efficient as, and less costly than, incarceration.
> See USSG 5 H1.1

It should be noted that the Courts have been sympathetic to granting departures based on a defendant's age if there is a combination of circumstance particularly when an individual has recurring health problems. In <u>United States v. Hildebrand</u>, 152 F. 3d 756 (8th Cir. 1998), the Court upheld a downward departure from a sentence of 51 to 63 months to a sentence of 5 years probation and 18 months of home confinement where a 70 year old individual convicted of mail fraud and money laundering had significant health issues. The Eight Circuit Court of Appeals specifically deferred to the District Court's judgment finding there was no abuse of discretion with regard to the granting of a downward departure. In <u>United States v. Baron</u>, 914 F. Supp. 660 (D. Mass. 1995), the Court granted a downward departure to a 76 year old defendant with substantial medical problems who was convicted of bank fraud and whose guideline range of 27 to 33 months was reduced to a sentence of probation. See also, <u>United States v. Dusenberry</u>, 9 F.3d 110 (6th Cir. 1993) (downward departure granted due to defendants age and medical condition); <u>United States v. Moy</u>, 1995 WL 311441 (N.D. Ill. 1995) (District Court granted downward departure to a 78 year old defendant who suffered from a coronary artery disease); <u>United States v. Maltese</u>, 1993 WL 22350 (N.D. Ill. 1993) (District Court granted downward departure to 62 year old defendant who had been suffering from liver cancer for approximately one year prior to sentencing).

Therefore, there is no question that the combination of an individual who is elderly with significant physical infirmities constitutes a logical basis for a combination of factors which justifies 3553(a) consideration. In this case, Mr. Castellazzo has reached the age of 75 years old at the time of the writing of this sentencing letter. Obviously, in conjunction with his age, he

15

has been engaged in an on-going health battle which requires constant medical diagnosis and intervention.

For these reasons, the combination of Mr. Castellazzo's age with the significant medical conditions which have afflicted him over the past several years furnishes a legitimate basis for this Court to exercise its discretion and fashion an appropriate sentence considering the factors enumerated in 3553(a) of Title 18.

## VIII  **No Fine Should Be Imposed**

We recognize that the Court has the discretion to impose a fine pursuant to USSG 5E1.2. However, it is respectfully urged that no fine should be imposed. Pursuant to his plea agreement the defendant has consented to forfeiture in the sum of $424,000.

As the PSR accurately reflects the defendant and his wife Sophie live in a "mobile home" in New Jersey valued at approximately $30,000. Photographs of this mobile home have been attached for this Court's review (See defendant's Exhibit 20). As verified by the PSR, the defendant and his wife Sophie receive Social Security Income and food stamps. They have very little assets outside of the above. The PSR concludes in paragraph 95 that "[B]ased on the defendant's financial profile he appears unable to pay a fine".

## **Conclusion**

At the sentencing on January 30, 2013 I beseech the Court, for all the reasons set forth herein, to impose a sentence below the guideline range set forth in the PSR. While I concur with the calculations in the PSR which lead to an advisory guideline range of 77-96 months which must, of course, be consulted but are only advisory, I submit a non-guideline sentence is appropriate. Given the unique facts at bar, especially the defendant's age, health, family circumstances, early guilty plea and all the other factors to be considered under Section 3553(a), such a sentence is well within the Court's discretion. As the Court knows better than counsel, the goal to be achieved is

a sentence which is "sufficient but not greater then necessary" under all the circumstances. A sentence substantially below the advisory guideline range will clearly meet this statutory standard.

Dated: Brooklyn, New York
      January 7, 2013

                                  Respectfully submitted,

                                  James J. DiPietro
                                  Attorney for defendant
                                  Benjamin Castellazzo
                                  186 Joralemon Street
                                  Brooklyn, N.Y. 11201
                                  (718) 875-4207

To: AUSA Elizabeth Geddes
    AUSA Allon Lifshitz
    (by ECF)
    James Foster
    U.S. Probation Officer
    (by regular mail)

17