

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/AL
F.#2010R00153

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 16, 2013

By Hand Delivery and ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Benjamin Castellazzo
>      Criminal Docket No. 11-30 (S-1)(KAM)

Dear Judge Matsumoto:

The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, which is scheduled for January 30, 2013.  For the reasons set forth below, the government respectfully asks the Court to impose a sentence of imprisonment within the range prescribed by the United States Sentencing Guidelines ("Guidelines"), which is 77 to 96 months, and a fine within the advisory Guidelines range of $10,000 to $100,000.

## BACKGROUND

On January 12, 2011, a grand jury in the Eastern District of New York returned an indictment (the "Indictment") charging the defendant and thirty-eight co-defendants with a variety of crimes, including racketeering conspiracy, based on their leadership of, membership in and association with the Colombo organized crime family of La Cosa Nostra (the "Colombo crime family" and "LCN," respectively).  (Docket Entry No. 1.) The defendant was, during the relevant period, the underboss of the Colombo crime family, as well as a captain, soldier and associate in that crime family.  (Id. ¶ 13; Superseding Information (Docket Entry No. 533) ¶ 12; Presentence Investigation Report ("PSR") ¶ 11.)

The defendant was charged in Count One of the Indictment with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), including as racketeering acts ("RAs") the

extortionate extension and collection of credit, in violation of 18 U.S.C. §§ 892(a) and 894(a)(1) (RA 6), three separate extortion conspiracies, in violation of 18 U.S.C. § 1951(a) (RAs 10, 34 and 36), and two separate money laundering conspiracies, in violation of 18 U.S.C. § 1956(h) (RAs 11 and 19).[1]  (Indictment ¶¶ 17-18, 27-29, 37-42, 55, 89-91, 93-95.)

On January 20, 2011, the indictment was unsealed and the defendant was arrested.  (Docket Entry Nos. 2, 37.)  On September 15, 2011, the defendant pled guilty to a superseding information (the "Superseding Information") charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), including two racketeering acts, each based on a separate extortion conspiracy.  (Superseding Information (Docket Entry No. 533) ¶¶ 13-16.)

I.   The Defendant's Position

In the Spring of 2008, the defendant was elevated to the position of underboss of the Colombo crime family.  In his capacity as the underboss, the defendant met frequently with other members of the Colombo crime family administration, as well as with captains of the crime family.  The defendant also participated in a months-long project to re-energize the Colombo crime family by recruiting old members to become more active in the affairs of the crime family and by injecting new blood into the crime family, i.e., inducting new members.  In particular, in his capacity as underboss, the defendant helped to preside over the February 1, 2009, ceremony in which co-defendants Anthony Russo, Joseph Savarese, Emanuel Favuzza and John Maggio, along with another individual, were inducted as members of the Colombo crime family.

In addition, the defendant planned to preside over a ceremony in December 2010 in which co-defendant Larry Sessa and others were scheduled to be inducted into the Colombo crime family.  To prepare for the ceremony, the defendant directed Anthony Russo to secure a firearm for use in the ceremony.

---

[1]     In addition, the defendant was charged in Count Seven with the money laundering conspiracy alleged in RA 11, in Count Fifteen with the money laundering conspiracy alleged in RA 19, and in Count Forty-One with the extortion conspiracy alleged in RA 34.  He was also charged in Count Fifty-Nine with using, carrying a possessing a firearm in relation to the racketeering conspiracy charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (ii).

Following the defendant's instructions, Anthony Russo obtained a firearm from Sessa and delivered it to Favuzza's residence, where the ceremony was scheduled to take place. Ultimately, due in part to perceived law enforcement scrutiny, the ceremony was cancelled.

II. <u>Criminal Activity</u>

In his capacity as a member of the Colombo crime family, the defendant directly oversaw, and profited from, a litany of crimes, several of which are described below. Significantly, in his capacity as the underboss, the defendant also sanctioned and indirectly oversaw, and profited from, several of the crimes of violence alleged in the Indictment. For his participation in the racketeering conspiracy to which he pled guilty, the defendant should be held accountable -- by the imposition of a term of imprisonment within the Guidelines range of 77 to 96 months -- for all of these crimes. Without a hierarchy, of which the defendant, as the underboss, was a critical member, structured criminal organizations such as the Colombo crime family could not thrive or even survive. That is, members and associates of the crime family could not commit the bread and butter crimes of the mafia such as loansharking and extortion -- crimes that depend upon the existence of a crime family to succeed -- if not for leaders like the defendant.

    A.    Extortion and Money Laundering - <u>Roger Califano's Gambling Business</u>[2]

For several years prior to their arrest in 2011, the defendant, together with co-defendants Joseph Carna (a captain within the Colombo crime family), Anthony Russo (an acting captain within the Colombo crime family), Nicky Rizzo (a soldier in the Colombo crime family), Angelo Spata (an associate in the Colombo crime family) and others, including former Colombo family street boss Thomas Gioeli, conspired to launder the proceeds of a lucrative illegal sports-betting business operated by co-defendant and Colombo crime family associate Roger Califano and others. Specifically, Califano made yearly tribute payments, ranging between $5,000 and $10,000, at Christmas time to members of the Colombo crime family in exchange for their "allowing" him to operate his illegal gambling business without risk of interference from other LCN families.

---

[2]    In the Indictment, this money laundering conspiracy was alleged as RA 19 of Count One and charged in Count Fifteen.

Between 2005 and 2008, Califano reported to Nicky Rizzo, who in turn reported to Gioeli, then the Colombo family street boss. Each Christmas between 2005 and 2007, Califano provided a percentage of the proceeds of his sports-betting business to Rizzo, who provided the money to Gioeli. In 2005 and 2006, Califano provided $5,000, but in 2007, after a particularly profitable year, Califano provided $10,000. Following Gioeli's incarceration in June 2008, Califano continued to report to Rizzo, but was subsequently transferred to Carna and the defendant, who by then held the position of underboss. The defendant demanded that Califano continue to pay an annual sum of $10,000. Accordingly, at Christmas time in 2008, Califano provided $10,000 to the defendant, $5,000 of which the defendant gave to Spata, who provided it to members of the family of Carmine Persico, the incarcerated official boss of the Colombo crime family.

In July 2009, Califano was transferred to Anthony Russo's crew. Anthony Russo attempted to negotiate with Colombo family member Theodore Persico, Jr., who is Carmine Persico's nephew, and Colombo family associate Michael Persico, who is Carmine Persico's son, to reduce the amount Califano had to pay each Christmas from $10,000 to $5,000, but the Persicos refused to reduce the amount. In addition, Spata told Anthony Russo that Alphonse Persico, who is another son of Carmine Persico, and who previously served as acting boss of the Colombo crime family, confirmed to Spata that Califano owed $10,000, not $5,000. However, Russo told the defendant that Califano was only going to pay $5,000 and that the defendant should attempt to collect the remaining $5,000 from Califano's father, Ronald Califano, who formerly was a partner in Califano's gambling business. The defendant told Russo that he had sent Colombo crime family soldier Salvatore "Sally Boy" Castagno to try to collect the money from Califano's father.

At Christmas in 2010, the defendant and Spata repeatedly reminded Anthony Russo to collect the $10,000 payment from Califano. Anthony Russo, however, resisted collecting the payment because he believed that FBI agents have recently served a subpoena on Califano in regard to these payments.

B.  Extortion and Money Laundering -
    <u>Johnny Azzarelli's Illegal Gambling Business</u>[3]

Between 2000 and the 2011, co-defendant John Azzarelli, also known as "Johnny Cash," operated a lucrative illegal gambling business in which he and others placed joker-poker machines in various Brooklyn establishments. The business earned more than $2,000 in revenue in a single day.

Azzarelli made monthly payments to the Colombo crime family in exchange for the crime family "allowing" him to place and maintain joker-poker machines in these establishments without risk of interference from other LCN families. These monthly payments initially were $8,000 (representing four weekly payments of $2,000), but were later increased to $10,000 when the Colombo crime family learned that Azzarelli had expanded the business into additional locations in Brooklyn. Between 2000 and 2003, Azzarelli gave these monthly payments to then-Colombo crime family consigliere Joel Cacace. Following the incarceration of Cacace in 2003, Azzarelli gave the payments to Colombo crime family captain Dino Calabro and Calabro's close criminal associates. In 2008, following Calabro's incarceration, Azzarelli began making the payments to the defendant. In July 2010, FBI agents surveilled Azzarelli making one of these payments to the defendant at a social club in Brooklyn run by the defendant.

C.  <u>Extortion Conspiracy - Gambino Crime Family</u>[4]

On May 16, 2010, Colombo crime family associate Walter Samperi was stabbed by an associate of the Gambino crime family. Samperi initially went to Lutheran Medical Center, but was discharged after two weeks in part because he did not have insurance and could not pay his medical bills. To compensate, members of the Colombo family initiated a "beef" with John Gambino, a member of the Gambino crime family's administration.

Initially, members and associates of the Colombo crime family met with an acting captain in the Gambino crime family. On June 4, 2010, Anthony Russo and the Gambino crime family acting captain discussed the Samperi situation in the presence of

---

[3]  In the Indictment, this money laundering conspiracy was alleged as RA 11 of Count One and charged as Count Seven.

[4]  In the Indictment, this extortion conspiracy was alleged as RA 34 of Count One and charged as Count Forty-One.

-5-

a cooperating witness (the "CW"). The Gambino crime family acting captain explained that he agreed to first approach the family of the individual who stabbed Samperi to determine how much money they were willing to pay Samperi and to then meet with John Gambino to see if he could obtain free rehabilitation for Samperi at a clinic controlled by the Gambino crime family.

On June 29, 2010, co-defendants Fusco, Dennis Delucia (a captain in the Colombo crime family) and Anthony Russo, and another met with Gambino and the Gambino crime family acting captain. Immediately after the meeting, the members of the Colombo crime family's administration -- co-defendant Andrew Russo, the defendant and co-defendant Fusco -- and New York City-based captains including co-defendants Carna, Delucia and Anthony Russo met at a residence in Staten Island, where they discussed, among other things, the dispute over Samperi. The meeting was captured in a consensually-made recording. Andrew Russo, as the street boss of the Colombo crime family, presided over the meeting.

At the outset, Andrew Russo admonished Anthony Russo and the others present that they should not attend a sit-down with another LCN family without first alerting the Colombo family administration. With respect to the stabbing of Samperi, Andrew Russo observed that they should have first "g[o]t even" and then initiated discussions with the Gambino family. The group proposed that Samperi sue the city for failing to protect him, or file for disability, but abandoned these ideas because Samperi lacked legal status in the United States. Andrew Russo then said, "I need help, what do you think." At that point, all agreed that Samperi would not be permitted to sue the individual who stabbed him because he would be termed a "snitch" if he did. During the conversation, one of the captains commented that "they're [a reference to the Gambino crime family] worried about us [a reference to the Colombo family] retaliating." The administration and the captains then discussed a variety of ways to obtain compensation for Samperi. They ultimately agreed that, in exchange for their promise not to retaliate, the Colombo family would require the Gambino family to make a one-time payment of $150,000, $100,000 of which was to come from the Gambino family's "basket" from the "feast," a reference to the Figli di Santa Rosalia, an annual Italian feast held in late August on 18th Avenue in Brooklyn.[5]

---

[5] Consensual recordings made during the course of the investigation demonstrate that the Colombo crime family has controlled the Figli di Santa Rosalia for several years.

D.  <u>Extortionate Collection - John Doe #13</u>[6]

John Doe #13 operated an illegal sports-betting business. As part of that business, a gambler placed a winning bet with John Doe #13, and John Doe #13 refused to pay the winnings to the gambler. The gambler approached the CW, who instructed the gambler to ask John Doe #13 if he had a "friend[,]" <u>i.e.</u>, an inducted member of organized crime, and to find out if any LCN members or associates backed John Doe #13's sports betting business.

The CW subsequently discussed the outstanding debt with co-defendant and Colombo crime family soldier Joseph Savarese, who told the CW to give Savarese's phone number to the gambler to give to John Doe #13. Ultimately, Savarese agreed to conduct a "sitdown" with Gambino crime family soldier Ernie "Ernie Boy" Abbamonte on July 7, 2010, at a Manhattan restaurant. On July 7, 2010, Savarese, the CW and the gambler met John Doe #13 and Abbamonte, among others, at the Madison Restaurant. The group, however, could not reach an agreement at this sitdown.

On July 22, 2010, Savarese called the CW and said, "I was reaching out, a little pushy with the guy with [the situation involving the gambler] . . . I told the other guy you were going to get back to me the next day . . . I was pushing it so I called him back." Savarese explained, however, that he then "got a message from the Claw [a reference to the defendant], [who] said you have a situation with Ernie [Boy Abbamonte] [and] to put it on hold 'til I [the defendant] apeak to you [Savarese] tomorrow." When the CW asked whether the defendant would "take their side," Savarese responded, "Anthony [Russo] told him [the defendant] what happened and he [the defendant] said, 'Fuck that, youse guys didn't do anything wrong . . . He [the defendant] won't take their side, he likes the drama."

The defendant ultimately met with Abbamonte and arranged for John Doe #13 to pay a portion of the winnings to the gambler. For his efforts, the defendant received a percentage.

---

[6]  In the Indictment, this extortion was alleged as RA 36 of Count One.

-7-

E.   <u>Extortion - Razzle Dazzle</u>

In the summer of 2010, a Genovese crime family soldier complained to Anthony Russo that Angelo Spata was preventing the Genovese crime family soldier's brother from placing "Razzle Dazzle" games in New York City-area Italian feasts, including the Figli di Santa Rosalia. Razzle Dazzle games are rigged games of chance, which games contestants rarely win; the games are therefore very lucrative.

To attempt to resolve the dispute, Anthony Russo, then a Colombo crime family acting captain, arranged a meeting at the Salty Dog on 3rd Avenue in Brooklyn. In attendance at the meeting were the Genovese crime family soldier, Spata, Anthony Russo and another. At the meeting, Spata told the Genovese crime family soldier that he would not permit the Razzle Dazzle games at the feasts because it would attract law enforcement scrutiny. In response, the Genovese crime family soldier told Spata that he knew that Spata operated a similar game at these feasts.

Anthony Russo next met with the defendant, in the defendant's capacity as the Colombo crime family's underboss, to try to resolve the situation. The defendant told Anthony Russo that co-defendant Emanuele Favuzza was a partner of the Genovese crime family soldier's brother in the Razzle Dazzle venture and received a portion of the proceeds generated by the game. Anthony Russo then met Spata at a street fair on 84th Street and 4th Avenue, and then met the Genovese crime family soldier a couple of blocks away. Thereafter, Anthony Russo, the defendant, Spata and the Genovese crime family soldier met at a sushi restaurant on 4th Avenue. The defendant arranged for the Genovese crime family to place the Razzle Dazzle game in the feasts, beginning with the 18th Avenue feast (<u>i.e.</u>, Figli di Santa Rosalia), in exchange for which Spata and the Genovese crime family soldier would each get $7,500 of the proceeds. Spata later told Anthony Russo that he was required to split his portion of the proceeds with the defendant. The Genovese crime family soldier then gave Anthony Russo $1,000 for his assistance.

F.   Extortion – John Doe #1[7]

In the early 1990s, Joseph Scopo, the brother of co-defendant and Colombo crime family soldier Ralph Scopo, was the underboss of the Colombo crime family.  Joseph Scopo negotiated a deal with the Gambino crime family providing that John Doe #1, who owned a construction company, would make a lump-sum payment and, thereafter, monthly payments to the Gambino and Colombo crime families.  The Gambino crime family received an initial lump-sum payment of $75,000 and, thereafter, $5,000 monthly payments, and the Colombo crime family also received $5,000 monthly payments.  These payments continued until at least 2002.

By 2001, co-defendant Ralph Scopo, who at the time reported to the defendant, then a captain in the Colombo crime family, was "servicing" John Doe #1.  As a result of the defendant's position as Scopo's superior, the defendant received a portion of the proceeds collected.  Thereafter, Scopo started to report to Dino Calabro, another Colombo crime family captain, in place of the defendant.  By that time, Scopo was collecting $8,500 in proceeds on a monthly basis from John Doe #1, and Calabro instructed another Colombo crime family solider to give $1,000 of those proceeds to the defendant and the remainder to "the Persicos."

After the defendant was incarcerated in or around 2002, Calabro started to collect the $1,000 that previously went to the defendant for himself.[8]  However, because the defendant owed approximately $9,000 to the Persicos, Calabro was directed to repay that debt using the proceeds of the extortion of John Doe #1.  Calabro then paid off the defendant's outstanding loan.

---

[7]   This extortion was alleged in the Superseding Information as RA 1 of Count One (in which the victim is identified as John Doe #1) and in the Indictment as RA 10 of Count One (in which the victim is identified as John Doe #7).  In this letter, the victim is referred to as John Doe #1.

[8]   On February 27, 2002, the defendant was sentenced to a three-year term of imprisonment and directed to report to his designated facility on April 29, 2002.  (United States v. Castellazzo, 00 CR 840 (ILG) (E.D.N.Y.), Docket Entry No. 125.)

G. <u>Extortionate collection - John Doe #3</u>[9]

John Doe #3 was an associate of the Genovese crime family. In or around September 1998, he met with the defendant regarding a gambling debt that John Doe #3's cousin owed to the defendant. John Doe #3 agreed to take over this debt, and thereafter made payments as directed by the defendant.

H. <u>Extortion - John Doe #2</u>[10]

Colombo crime family associate Francis Guerra's wife's parents are part owners of L&B Spumoni Gardens ("L&B"), an Italian restaurant in Brooklyn, New York. The children of John Doe #2, a Bonanno family associate, worked at L&B. Subsequently, John Doe #2 opened a pizzeria on Staten Island called "The Square," and Guerra came to believe that John Doe #2 had stolen a sauce recipe from L&B.

In the summer of 2010, Guerra, Anthony Russo and a Colombo family associate Frank "Frankie Notch" Iannaci went to The Square and bought a pizza. When they saw John Doe #2 in front of the pizzeria, Iannaci assaulted him and Guerra yelled, "How could you disrespect my family?"

Bonanno crime family member Anthony Calabrese then looked for Anthony Russo. Anthony Russo and Calabrese met at St. Joseph's high school on Hylan Boulevard in Staten Island. Anthony Russo told Calabrese that John Doe #2 would have to make him and Guerra partners in The Square or close the place down.

The defendant learned about the assault of John Doe #2 from Ralph DiMatteo, a partner in The Square who was "on record" with the defendant. The defendant met with Anthony Russo, and approved Guerra's and Anthony Russo's efforts to obtain a portion of the proceeds of The Square, provided that they give a portion of any proceeds to the defendant.

A week later, Anthony Russo met with Calabrese and others. They agreed that John Doe #2 would provide $3,000 to $4,000 as a one-time payment. A few days later, Russo collected the money from Calabrese. Anthony Russo and Guerra split the

---

[9] In the Indictment, this extortionate collection was alleged as RA 6 of Count One.

[10] In the Superseding Information, this extortion was charged as RA 2 of Count One.

-10-

money and gave $500 to the defendant, whom they had kept apprised of the situation, because of DiMatteo's involvement in The Square.

DISCUSSION

The government respectfully submits that the Court should impose a sentence of imprisonment within the advisory Guidelines range of 77 to 96 months and a fine within the advisory Guidelines range of $10,000 to $100,000.

I.  Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

II. The Guidelines Range Is 77 to 96 Months

The Probation Department has determined that the total offense level is 24, that the defendant is in Criminal History Category IV, and that the advisory Guidelines range of imprisonment is therefore 77 to 96 months. (PSR ¶¶ 29-63, 97.) This is consistent with the range estimated by the government in the plea agreement, and, as the defendant recognizes, he stipulated to this range. (Plea Agreement ¶ 2; Def.'s Stg. Mem. (Docket Entry No. 1061) at 4.)

The defendant asks the Court to "consider as a starting point under [Section] 3553(a), a sentence at least two levels below the guidelines range" because he pled guilty early, and defendants who pled later have been awarded two-level reductions in their Guidelines ranges based on a global disposition. (Def.'s Stg. Mem. (Docket Entry No. 1061) at 7-8.) Because the defendant stipulated to the Guidelines range set forth in the plea agreement, as he concedes in his sentencing memorandum, and the government did not, and will not, move for such a reduction, a reduction in the offense level or Guidelines range is not warranted. Indeed such a reduction would be an error. United States v. Folkes, 622 F.3d 152, 156 (2d Cir. 2010) ("An error in calculating the applicable Guidelines range is among the kinds of procedural error that renders a sentence unreasonable.").

However, the government does not object to the Court considering, under Section 3553, the fact that the defendant pled guilty early and may have contributed to the entry of guilty pleas by several of the remaining defendants. Of course, in fashioning an appropriate sentence, the government submits that the Court should also consider all of the defendant's crimes, most of which were not factored into the determination of the offense level and Guidelines range of imprisonment even though they constitute relevant conduct. United States v. Ruggiero, 100 F.3d 284, 292 (2d Cir. 1996).

III. A Sentence Within the Guidelines Range Is Appropriate In This Case

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range of 77 to 96 months is appropriate.

A. The Natures and Circumstances of the Offense

The defendant has been convicted of racketeering conspiracy, a very serious crime. That is, the defendant has been convicted of participating in the affairs of a criminal enterprise -- the Colombo crime family -- in connection with which the defendant agreed that he or another member would commit at least two racketeering acts. As part of his allocution, the defendant admitted to his participation in two extortions. Numerous other racketeering acts for which the defendant should be held accountable at sentencing are set forth above or alleged in the Indictment.

While the extortions to which the defendant allocuted -- the extortion of construction company owner John Doe #1 and

restaurant owner John Doe #2 -- are themselves significant crimes that merit a lengthy term of imprisonment, in this case the defendant's role in the overarching racketeering conspiracy merits special attention. As noted above, the defendant was the underboss, or second-in-command, of the entire Colombo crime family. (PSR ¶¶ 6, 11.) As the Court is aware, the Colombo crime family is a dangerous criminal enterprise that uses violence, including murder and assault, to further its interests. (Id. ¶¶ 5-7.) Because of the defendant's position in this enterprise, two significant facts emerge. First, the defendant had the full resources of the Colombo crime family, including its violent members and associates, at his disposal. Second, because of his position, he was able to profit any time a member or associate committed a crime.

These facts were vividly illustrated in the extortion of John Doe #2, the owner of The Square, who paid Anthony Russo and Francis Guerra after they and Frank Iannaci assaulted John Doe #2. The defendant profited from this assault because he outranked Russo and Guerra and because one of John Doe #2's business partners reported to the defendant. As a result, the defendant received payment by simply sanctioning the threat of violence.

Similarly, the defendant profited from the extortions of John Azzarelli and Roger Califano, who operated lucrative gambling businesses, simply because he outranked them within the Colombo crime family. And the defendant profited from the extortion of John Doe #1, who owned a construction company, simply because the defendant outranked co-defendant Ralph Scopo, who was directly involved in extorting John Doe #1.

These extortions demonstrate that the defendant was able, by virtue of his position as underboss, to get his "claw" into any crime committed by any member or associate of the Colombo crime family, including violent crimes. Therefore, a sentence below the Guidelines range would fail to adequately reflect the defendant's position within the Colombo crime family, which is, of course, the essence of his role in the charged racketeering conspiracy.

    B.    <u>The Defendant's History and Characteristics</u>

The defendant's history and characteristics show that he is committed to a life of crime and that a sentence within the Guidelines range is necessary and appropriate. 18 U.S.C. § 3553(a)(1).

As a preliminary matter, the defendant was a member of the Colombo crime family administration, one of three men responsible for administering the affairs of the criminal enterprise.  In his capacity as an administration member, the defendant attended numerous meetings with other high-ranking members of the Colombo family and presided over the induction of new member.  These facts are, in themselves, serious factors for sentencing.

In addition, his history includes four prior convictions.  Most recently, in 2002, the defendant was sentenced by Judge Glasser to a three-year term of imprisonment based on his conviction for conspiring to collect extortionate extensions of credit.  (PSR ¶¶ 59-60.)  That crime was committed while the defendant was a captain in the Colombo crime family, and the extorted money reflected payments for credit, gambling and other criminal activity conducted at a social club owned and supervised by the defendant.  (Id. ¶ 60.)

Before that, in 1995, the defendant was sentenced to an eight-month term of imprisonment following a conviction for operating an illegal gambling business.  (Id. ¶ 57.)  That conviction was based on the defendant's participation in a business that, under the auspices of LCN, held craps games, conducted illegal numbers betting operations and accepted wagers on sporting events.  (Id. ¶ 58.)  Before that, in 1976, the defendant was sentenced to a four-year term of imprisonment following a conviction for the unlawful use of a telephone in the commission of a felony.  (Id. ¶ 55.)  That conviction was based on the defendant's role in a heroin importation and distribution ring.  (Id. ¶ 56.)  And before that, in 1959, the defendant was sentenced to a four-to-eight-year term of imprisonment following his conviction for grand larceny.  (Id. ¶ 53.)  That conviction was based on the defendant's theft, with others, of a tractor-trailer truck containing carpeting.  (Id. ¶ 54.)

In addition, the defendant was arrested in 1958 for vagrancy, in 1969 for reckless endangerment and attempted possession of a dangerous weapon -- based on his alleged attempt to strike a victim with a baseball bat -- and in 1992 for promoting gambling.  (Id. ¶¶ 64-69.)  Furthermore, while serving the term of imprisonment imposed in 1976, the defendant received a misconduct report for being in an unauthorized area and being intoxicated in prison.  (Id. ¶ 56.)  And, after serving the term of imprisonment imposed in 2002, the defendant was found to have violated the terms of his supervised release by making unapproved stops before returning from a doctor's appointment and by

associating with a co-defendant, and as a result was sentenced to a thirty-day period of home confinement. (Id. ¶ 60.)

The defendant makes three arguments for leniency that relate to his history and characteristics. First, the defendant has submitted letters reflecting his relationships with his wife, children and other family members. (Def.'s Stg. Mem. (Docket Entry No. 1061) at 8-14.) However, to the extent the Court finds that the defendant has a positive family environment, that factor cuts against, not in favor of, leniency. People who are surrounded by caring family members have every opportunity to choose a law-abiding life, and it is defendants in the opposite circumstance -- defendants whose family circumstances may have contributed to their commission of crimes -- who may merit sympathy from the Court. It would be anomalous to give the defendant credit at sentencing for having a supportive family, and the Court should reject this argument.

Second, the defendant submits that he has health issues. (Id. at 14.) Significantly, however the defendant's alleged health issues did not prevent him from committing crimes or assuming a high-ranking position in the Colombo family, all in the very recent past. Therefore, a sentence that places undue reliance on the defendant's health would ignore his long history of committing crimes and would thwart the other purposes of sentencing, such as reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, and providing deterrence. Each of these factors, discussed below, is important in this case. Furthermore, given the defendant's position as underboss of the Colombo crime family, his health would not prevent him from committing more crimes in the future -- as his history and characteristics make clear he will -- because he can direct others to carry out crimes and pay him the proceeds of those crimes. Indeed, he cited his health as a factor when Judge Glasser sentenced him in 2002. (United States v. Castellazzo, 00 CR 840 (ILG) (E.D.N.Y.), Transcript of Sentencing dated February 27, 2002 ("2002 Stg. Tr.") (attached as Ex. A) at 4.) If health problems cited ten years ago did not affect his ability to commit crimes in the very recent past, there is no reason to believe that any current health problems will have that effect.

Third, the defendant asks the Court to consider his age. (Def.'s Stg. Mem. at 15-16.) To the extent the defendant seeks a Guidelines departure on the basis of age, that request should be rejected. The applicable Guideline provides that:

-15-

> Age (including youth) may be relevant in
> determining whether a departure is warranted,
> if considerations based on age, individually
> or in combination with other offender
> characteristics, are present to an unusual
> degree and distinguish the case from the
> typical cases covered by the guidelines. Age
> may be a reason to depart downward in a case
> in which the defendant is elderly and infirm
> and where a form of punishment such as home
> confinement might be equally efficient as and
> less costly than incarceration.

U.S.S.G. § 5H1.1. The government respectfully submits that the defendant's age is not unusual, even in combination with his other characteristics, and, in any event, the defendant has not satisfied his burden of showing that another form of punishment is equally efficient as and less costly than incarceration. In addition, leniency as a result of his age is particularly inappropriate because his age -- that is, his years of experience in committing crime, associating with the Colombo crime family and learning the ways of LCN -- largely contributed to his ability to rise to a position in the Colombo crime family administration (the majority of the members of which are often advanced in age). Furthermore, as with his health issues, the defendant also previously asked that his age be taken into account when Judge Glasser imposed sentence in 2002. (2002 Stg. Tr. at 4.) Because age did not prevent the defendant from committing crimes afterward, the Court should give it little to no weight when imposing sentence in this case.

In light of the defendant's long, repeated history of committing serious crimes, and in light of his previous appeals based on his age and health, a sentence within the advisory Guidelines range of imprisonment is warranted in this case, and a sentence below that range would not adequately reflect the defendant's history and characteristics.

   C.   Reflecting the Seriousness of the Offense,
        Promoting Respect for the Law and
        Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offense is serious, particularly when his important role within the Colombo crime family is considered. In addition, by engaging in a life of crime under the auspices of the Colombo crime

family, including by committing crimes after his repeated convictions, the defendant has demonstrated that he has no respect for the law.

    D.    <u>Affording Deterrence and Protecting the Public</u>

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." <u>United States v. Davis</u>, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

    1.    <u>Specific Deterrence and Incapacitation</u>

In this case, specific deterrence and incapacitation are critical. When the defendant became a member of the Colombo crime family, he took an oath, swearing to remain loyal to this violent criminal organization for the remainder of his life. The government respectfully submits that despite numerous claims to the contrary at sentencing proceedings, aside from those who decide to cooperate against members of the mafia (and therefore are not permitted to maintain a connection to the mafia upon disclosure of their cooperation), few if any members of the mafia give up their connections to the mafia even after serving significant terms of imprisonment.

The defendant's claims that a lenient sentence in this case are sufficient to deter him from committing additional crimes are particularly hollow here. Significantly, the defendant made such an argument to Judge Glasser when he was sentenced in 2002, when his counsel stated the following in reference to a Guidelines range of 33 to 41 months:

> [T]he low end of that guideline will be enough of a specific deterrent for this gentlemen based upon his age and based upon what he pleaded guilty to, to prevent him from committing similar conduct in the future.

(2002 Stg. Tr. at 4-5.) Clearly, however, the sentence imposed in that case (36 months, a sentence within the Guidelines range) did not serve to deter the defendant in any manner. Not only did he commit crimes after serving that sentence, but he even ascended to the position of underboss of the Colombo crime family. It is hard to imagine a more convincing fact showing

-17-

that a defendant has not been -- probably will not be -- deterred.

A sentence within the Guidelines range will, however, at least incapacitate the defendant, thereby protecting the public from further crimes by him. Incapacitation is particularly important because the defendant's role as underboss of the Colombo crime family means that he can get others to commit crimes for him, such that his age and health will never be sufficient to deter him from committing crime. Given the defendant's demonstrated inability to be deterred, the government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(C).

2. General Deterrence

In addition, a sentence within the advisory Guidelines range is necessary to deter others who are in a position to choose between a law-abiding life and a life of crime. At a July 2009 sentencing of a Colombo crime family captain, the Honorable Jack B. Weinstein imposed a sentence of 120 months, significantly above the Guidelines range of 63 to 78 months, and observed the following:

> I believe that under these circumstances, ten years is a sentence that is appropriate, not too long, not too great, and anything less would not send a message. The people, the youngsters in this city have to understand that they cannot join this organization and that when they do they destroy their lives.

United States v. Uvino, 07 CR 725 (JBW). Although in this case the government is not seeking a ten-year sentence -- it seeks only a sentence within the Guidelines range -- the government respectfully submits that a sentence within the Guidelines range is necessary to deter others from committing crimes and from getting involved in organized crime in the first instance. As Judge Weinstein highlighted, a sentence taking into account general deterrence is essential to send a message to young men in New York City of the consequences of joining the mafia and to deter them from joining in the first place.

IV. A Fine Within the Guidelines Range Is Warranted

The government also asks the Court to impose a fine. Section 5E1.2(a) of the Guidelines provides that "[t]he court

shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998).

In this case, although the Probation Department found an inability to pay (PSR ¶ 95), it does not appear that the defendant has in fact sustained his burden. In particular, the defendant reported assets of $32,515.17 and no liabilities, and his wife owns a 1995 BMW sedan and a 2002 Oldsmobile luxury sedan, valued at $5,001 and $8,776, respectively. (PSR ¶¶ 91-92.) Furthermore, the defendant's reported monthly income, which is apparently the basis of his inability to pay a fine, is based on social security and food stamps, and plainly excludes all of the illegal income earned from his various extortions and other crimes. (Id. ¶ 94.)

Therefore, in light of the defendant's reported assets and unreported, unlawful income, it is now appropriate that he "reimburse society for the drain on economic resources caused by [his] li[fe] of crime and for the high costs of [his] own necessary imprisonment." United States v. Sessa, 821 F. Supp. 870, 875 (E.D.N.Y. 1993) (Weinstein, J.). The government respectfully submits that the sentence in this case should include a fine within the advisory Guideline range of $10,000 to $100,000. U.S.S.G. § 5E1.2(c)(3).

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, the government respectfully submits that the Court should impose a sentence that includes a term of

imprisonment within the advisory Guidelines range of 77 to 96 months and a fine within the advisory Guidelines range of $10,000 to $100,000.

                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                  United States Attorney

                        By:        /s/
                                  Elizabeth A. Geddes
                                  Allon Lifshitz
                                  Assistant U.S. Attorneys
                                  (718) 254-6430/6164

cc:   Clerk of the Court (KAM) (by ECF)
      James J. DiPietro, Esq. (by ECF)
      James Foster, U.S. Probation Officer (by email)